UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                               :

RANDOLPH BLUM,
                               :

                Plaintiff,            :          <u>OPINION AND ORDER</u>

                               :

        -v.-
                               :          13 Civ. 3795 (GWG)

SPAHA CAPITAL MANAGEMENT, LLC <u>et al</u>.,  :

                Defendants.      :
-------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Randolph Blum brought this diversity action against defendants John VanClief

and Spaha Capital Management, LLC ("Spaha") raising claims for breach of contract, breach of

fiduciary duty, and unjust enrichment. Both sides have moved for summary judgment pursuant

to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, Blum's motion is

granted in part and denied in part, and defendants' motion is granted in part and denied in part.

I.     <u>BACKGROUND</u>

      A.    <u>Facts</u>

      In this case, each side submitted a statement of material facts pursuant to Local Civil

Rule 56.1 in which they supported some or all of their statements of material fact with citations

to admissible evidence as required by Local Civil Rule 56.1(d). However, while each side

submitted a counterstatement purporting to controvert the material facts listed by the other side,

neither side (with limited exceptions not relevant to this ruling) followed any of the paragraphs

of the counterstatement with "citation[s] to evidence which would be admissible, set forth as

required by Fed. R. Civ. P. 56(c)." <u>See</u> Local Civil Rule 56.1(d). Accordingly, the statements of

1

material fact in each side's Rule 56.1 statements are deemed admitted.  See Lorterdan Props. at

Ramapo I, LLC v. Watctower Bible & Tract Soc'y of N.Y., Inc., 2012 WL 2873648, at *1 n.1

(S.D.N.Y. July 10, 2012) (plaintiff's statements "deemed admitted" because "[d]efendant failed

to adhere to Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(d) in that it did not cite

to admissible evidence in support of its statements denying [p]laintiff's statements of material

fact"); Guarino v. St. John Fisher Coll., 553 F. Supp. 2d 252, 253-54 (W.D.N.Y. 2008)

("deem[ing] Defendant's factual assertion admitted" where plaintiff failed to cite to admissible

evidence ), aff'd, 321 F. App'x 55 (2d Cir. 2009).

Blum is a resident of Nevada, VanClief is a resident of New York, and Spaha is a New

York limited liability company.  See Complaint, filed June 4, 2013 (Docket # 1) ("Compl."),

¶¶ 2-4.  In 2004, Blum's friend Richard Andriola suggested that Blum contact VanClief about an

investment opportunity in a company called Virtual Scopics.  See Declaration of Randolph

Blum, filed Mar. 27, 2014 (Docket # 24) ("Blum Decl."), ¶ 1.[1]  Andriola informed Blum that

VanClief was a Senior Vice President in Institutional Sales at Matrix Investment Research/

Matrix USA LLC.  Id. ¶ 2.  Blum followed his friend's advice and invested in Virtual Scopics

through VanClief, id. ¶ 4, and later invested in an entity called "DAIS" through VanClief, id. ¶ 5.

---

[1] Defendants argue that the Court should not consider Blum's declaration because it does
not comply with 28 U.S.C. § 1746.  See Defendants Spaha Capital Management LLC and John
VanClief's Reply in Further Support of Their Motion for Summary Judgment and Memorandum
in Opposition to Plaintiff Randolph Blum's Cross-Motion for Summary Judgment, filed Apr. 7,
2014 (Docket # 30) ("Def. Reply"), at 3 n.1.  The Court rejects this argument because, although
the document is entitled "Declaration," it is in fact a sworn affidavit.  See Blum Decl. at 6
(containing notary seal).  As such, there is no requirement that it comply with 28 U.S.C. § 1746.
See Dubreus v. N. Shore Univ. Hosp., 2012 WL 5879110, at *3 (E.D.N.Y. Nov. 20, 2012)
("Although plaintiff's declaration does not contain language that substantially complies with the
statutory requirements of Section 1746, what defendants overlook is that the declaration was
sworn to before a notary public.  As the declaration is a sworn document, its admissibility does
not hinge on the requirements set forth in Section 1746.") (citations omitted).

In 2006, VanClief informed Blum that another company called Woodward Skate Parks ("Woodward") was "offering investment opportunities at '50 cents per share, 50% warrant coverage,' along with '8%'."  Id. ¶ 6 (citing Plaintiff's F.R.C.P. 26 Disclosure, dated Aug. 21, 2013 (annexed as Ex. 1 to Defendants' Rule 56.1 Statement, filed Mar. 7, 2014 (Docket # 19) ("Def. 56.1 Statement")) ("Pl. Disclosure"), at 8.  "[Blum] agreed to invest the money that [VanClief] had on account for [Blum] from the sale of the prior shares and additional cash that [Blum] sent to [VanClief], with the understanding that [Blum] would receive 246,000 shares, warrants for 123,000 shares, and 8% on [his] investment in exchange for $123,000.00."  Id. ¶ 7 (citing Pl. Disclosure at 17); see also Defendants' Rule 56.1 Statement in Response to Plaintiff's Cross-Motion Rule 56.1 Statement, filed Apr. 7, 2014 (Docket # 29) ("Def. 56.1 Reply"), ¶ 21.  Blum alleges that he considered VanClief to be his broker in this deal and thus relied on VanClief "to execute the deal as he agreed."  Blum Decl. ¶ 8; see also Def. 56.1 Reply ¶ 22.  VanClief "informed [Blum] that [he] would receive shares at 50 cents a share, 50% in warrants, and interest of 8%."  Blum Decl. ¶ 9; Plaintiff's Counter 56.1 Statement, filed Mar. 28, 2014 (Docket # 27) ("Pl. 56.1 Statement"), ¶ 23.  While defendants have not properly controverted Blum's Rule 56.1 statement on this issue, defendants have introduced as exhibits two subscription agreements that they allege evidence Blum's acquisition of the 246,000 shares in Woodward but not the warrants for 123,000 shares.  See Declaration of John VanClief in Support of Defendants' Spaha Capital and John VanClief's Motion for Summary Judgment, filed Mar. 7, 2014 (Docket # 20) ("VanClief Decl."), ¶¶ 5-6.  Both agreements are signed by Blum, but not by a representative of Woodward.  See Subscription Agreement and Accredited Investor Questionnaire, dated May 23, 2006 (annexed as Ex. 3 to Def. 56.1 Statement); Subscription Agreement and Accredited Investor Questionnaire, dated May 23, 2006 (annexed as Ex. 4 to

Def. 56.1 Statement).

After receiving 246,000 shares in Woodward, Blum emailed VanClief to inquire about the warrants for the other 123,000 shares.  See Blum Decl. ¶ 11 (citing Pl. Disclosure at 24).  In response, VanClief "confirmed that [Blum] was still owed 123,000 shares for 50% warrants." Id. ¶ 12.  Blum's papers cite to an instant messenger conversation between Blum and VanClief from May 27, 2007, in which Blum asked, "what about my 123 extra shares," and VanClief replied, "ur extra shares I think will be a dividend in retail."  Pl. Disclosure at 28.  Blum then asked, "that was the 50% on top on the 246," and VanClief responded, "I guess that is it—correct 123."  Id.  Blum ended the conversation by writing, "Get me my extra ww share" and to which VanClief replied, "will do!"  Id. at 29.  In a separate conversation dated July 25, 2007, VanClief told Blum that he was "working on the 123K," presumably referring to the warrant shares.  Id. at 32.  Similarly, in an email dated July 30, 2007, VanClief wrote, "[r]egarding the WW shares, I am checking into it . . . so give me a bit of time and I will get it done."  Id. at 36.[2] Blum also asked VanClief "about the 8% that was supposed to be paid on the investment." Blum Decl. ¶ 13 (citing Pl. Disclosure at 30).

Blum continued to ask VanClief about the warrant shares and the 8% return for "about three years," but "[e]very time [he] asked [VanClief] about these issues, [VanClief] would promise to do something about it, but never did."  Id. ¶ 14.[3]  According to VanClief, on

---

[2] While defendants' Rule 56.1 counterstatement denies that VanClief ever confirmed to Blum that he was owed the 123,000 shares for the warrants, see Def. 56.1 Reply ¶ 26, it cites no evidence to support this denial.  Accordingly, Blum's assertion that "VanClief confirmed that [Blum] was still owed 123,000 shares for the 50% warrants," Pl. 56.1 Statement ¶ 26, is deemed admitted.

[3] Defendants' Rule 56.1 counterstatement denies this assertion without supplying any supporting evidence.  Def. 56.1 Reply ¶ 28.

December 13, 2007, Woodward filed for Chapter 11 bankruptcy, and "Blum's interest in Woodward . . . was part of the bankruptcy filing."  VanClief Decl. ¶ 9.  At this point, Spaha purchased Woodward through the bankruptcy process, id. ¶ 10, and "agreed to carry Blum's investment in Woodward," id. ¶ 11.  When Blum's investment was originally made in 2006, however, neither VanClief nor Spaha had any interest in Woodward.  See id. ¶ 8.

At some unspecified point after the three-year period in which Blum sought relief from VanClief, Blum asked VanClief if he "would agree to take the shares back and pay [Blum] the money that [he] was owed for the shares and the 8%."  Blum Decl. ¶ 15.  According to Blum, "in April 2010, [VanClief] agreed to send [Blum] the 123,000 shares that [he] was owed."  Id. ¶ 16; see also id. ¶ 17; Pl. Disclosure at 59-60.  But when VanClief purported to send Blum a package containing the shares in June 2010, Blum in fact received "a certificate that purported to be worth 54,000 shares of [Woodward], but which . . . was simply a fake document printed by [VanClief] himself."  Blum Decl. ¶¶ 19-20.[4]

Blum asserts, "[o]n September 1, 2011, I had a phone conversation with [VanClief] and a financial advisor named Mike Hood, in which [VanClief] acknowledged that he had breached his financial duty to me as my broker to obtain the correct number of shares and [VanClief] agreed to buy out all of the shares that I had bargained for totalling [sic] 369,000 in return for $269,000.00."  Blum Decl. ¶ 26.  In support of this, Blum cites to an email he sent to VanClief on September 6, 2011, stating, "We are waiting for your emailing documenting our telephone conversation that occurred on 1Sept11.  During this conversation you offered me a pre-IPO buyout of all my shares of WW(369,000) for $269,000 within 30 days."  Pl. Disclosure at 90.

---

[4] Defendants' Rule 56.1 counterstatement denies this assertion without supplying any supporting evidence.  Def. 56.1 Reply ¶¶ 29-31, 34.

According to Blum, VanClief then prepared and sent to Blum on September 15, 2011, a preliminary agreement regarding the alleged buyout.  See Blum Decl. ¶ 27; Def. 56. Reply ¶ 41 (admitting this contention).

Two documents in the record appear to be preliminary drafts of the alleged buyout agreement — neither of which bears a signature of any party.  The first document — titled "Stock Purchase Agreement" — refers to Blum as the "seller" and states, "Purchaser shall purchase from Seller 369,000 shares of Common stock, issued by [Spaha] dba [Woodward], in consideration of a promissory note in the amount of $267,500.00 . . . secured by a pledge of the stock."  Pl. Disclosure at 93.  The second document — titled "Stock Purchase and Indemnification Agreement" — states, "whereas . . . [i]t is the sole intent to repurchase from Randolph Blum his interests and 369,000 shares of [Spaha] dba [Woodward] . . . Blum will ask for $267,500 for his entire interest and/or negotiate the best offer for the buyer and seller between all parties involved . . . and said parties will attempt to have the said stock purchase agreement reached and completed by October 31, 2011."  Id. at 95.

Frustrated that this first draft of the agreement would only give him a promissory note in exchange for his shares, Blum wrote an email to VanClief on September 15, 2011, stating, "Do not try to BS me or Mike.  Make the contract very very simple — On this date Randolph Blum will receive $269,750.00 in CASH for 369,000 shares of WW."  Id. at 102.  On September 23, 2011, VanClief appears to have emailed to Blum a second draft of the agreement.  See id. at 116. This revised draft states, "Purchaser shall purchase from [Blum] 369,000 shares of Common stock, issued by [Spaha] dba [Woodward], in consideration for cash in the amount of $269,750.00 . . . secured by a pledge of the stock."  Id. at 118.  Blum signed this document and the accompanying "Stock Purchase Contract," which declares that "Blum will receive . . .

6

$269,750 for his entire interest" and that "Blum and Purchaser will agree to terms and thus execute the stock purchase agreement."  Id. at 119.  However, neither of these documents were signed by anyone on behalf of Spaha.  See id. at 118-19.  Blum again spoke with VanClief on the phone on September 30, 2011, during which VanClief "proposed to pay [Blum] the amount of $300,000.00 for the shares and for the 8% interest that [Blum] was owed for [his] initial investment of $123,000.00."  Blum Decl. ¶ 28.[5]

On November 2, 2011, VanClief sent Blum what appears to be the final draft of the agreement, which is the document that Blum relies on for his breach of contract claim.  See Pl. Disclosure at 140.  This document — which we refer to as the "Contract" even though its validity is disputed — is not formatted in a manner similar to the agreements just described. Instead, it is in the form of a letter on the letterhead of "Spaha Capital Management LLC."  See id. at 148.  The substantive portion of the Contract states as follows:

> This contract stipulates that payment of $150,000 is due from Spaha Capital Management, LLC to Mr. Blum on November 7th, 2011.  Subsequent payment of an additional $150,000 to Mr. Blum is due on November 11th, 2011.  Said payments can be broken up into traunches [sic] as they fund into Spaha Capital Management, LLC to Mr. Blum as long as they total $300,000 by November 11, 2011.  This close will conclude all business between Spaha Capital Management, LLC and Mr. Randolph Blum.

Id.  This paragraph is followed by the statement, "The funds will be sent to the following:" after which appear Blum's bank and account information.  Id.

The Contract was signed both by Blum and by VanClief.  Id.  Underneath VanClief's name are the words "Managing Director," followed by "Spaha Capital Management, LLC" and an address in New York.  Id.  Blum asserts that "[t]his document was intended to memorialize

---

[5] Defendants' Rule 56.1 counterstatement denies Blum's assertions regarding the telephone calls without supplying any supporting evidence.  Def. 56.1 Reply ¶¶ 40, 42.

the agreement that [VanClief] and [Blum] had made, which was for [VanClief] to pay [Blum] $300,000.00 in exchange for [Blum's] shares and the 8% interest that [he] was owed." Blum Decl. ¶ 36.[6]

Despite the fact that both parties signed this document, Blum "never received the money." See Blum Decl. ¶ 39. Blum "contacted [VanClief] repeatedly about when [he] would receive [the] payment and [VanClief] had excuse after excuse." Id. ¶ 37; see also Pl. Disclosure at 152-173. Blum then filed suit against VanClief in the United States District Court for the District of Nevada and obtained a default judgment, but the New York state courts refused to recognize the judgment. Id. ¶ 38.

### B.   Procedural History

Blum filed his complaint against defendants on June 4, 2013, raising three claims. See Compl. First, Blum alleges that the parties "entered into a contract on or about November 2011 in which Defendants agreed to pay [Blum] $300,000.00 for all [Blum's] shares of Defendant Spaha . . . [and] Defendants breached the agreement causing [Blum] to suffer damages in the amount of $300,000.00 plus interest from November 11, 2011." Id. ¶¶ 21-23. Second, Blum asserts that "[a]s a broker acting on behalf of [Blum] in the purchase of shares, Defendant Van Clief [sic], owed a fiduciary duty to [Blum]," and VanClief breached that fiduciary duty when he "failed to turn over the 123,000 shares for the warrant or the $300,000.00 owed to [Blum]." Id. ¶¶ 24-26. Third, Blum has raised a claim for unjust enrichment, contending that "Defendants received the benefit of the $123,000.00 [paid by Blum] in 2006 but did not produce the shares owed to [Blum] pursuant to the warrant." Id. ¶¶ 27-29. Blum seeks $300,000 in compensatory

---

[6] Defendants' Rule 56.1 counterstatement denies Blum's assertion without supplying any supporting evidence. Def. 56.1 Reply ¶ 50.

damages, punitive damages, and costs and attorney's fees.  See id. at 5.

Each side has now moved for summary judgment.[7]

II.   APPLICABLE LAW

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)) (additional citation omitted), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citations

---

[7] See Defendants' Notice of Motion (Amended), filed Mar. 7, 2014 (Docket # 18); Def. 56.1 Statement; VanClief Decl.; Defendants Spaha Capital Management LLC and John Vanclief's Memorandum in Support of Their Motion for Summary Judgment, filed Mar. 7, 2014 (Docket # 21) ("Def. Mem."); Plaintiff's Memorandum of Law, filed Mar. 27, 2014 (Docket # 22) ("Pl. Mem."); Declaration of Jason M. Baxter, filed Mar. 27, 2014 (Docket # 23); Blum Decl.; Pl. 56.1 Statement; Plaintiff's Notice of Cross-Motion for Summary Judgment, filed Mar. 28, 2014 (Docket # 28); Def. 56.1 Reply; Def. Reply; Declaration of Tristan C. Loanzon in Reply, filed Apr. 7, 2014 (Docket # 31).

omitted).  In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  Anderson, 477 U.S. at 256.

III.     DISCUSSION

     A.     Choice of Law

       Because the parties were located in two different states, this case raises the question of whether to apply the law of New York or Nevada to Blum's claims.  Defendants state that "because the laws of Nevada and New York appear[ ] to be in accord as to the principle of the common law of contracts, the court may apply New York law."  Def. Mem. at 8.  However, defendants do not address the choice of law issue for Blum's other claims.  Blum does not address the choice of law issue at all, but his brief cites exclusively to New York and federal cases.  See Pl. Mem. at ii.  In these circumstances, we will apply New York law.  See Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law.") (internal punctuation and citation omitted); Severstal Wheeling Inc. v. WPN Corp., 809 F. Supp. 2d 245, 255 (S.D.N.Y. 2011) ("Because all parties have relied on New York State law in their memoranda of law, they have implicitly consented to the application of New York law.").

     B.     Blum's Breach of Contract Claim Against Spaha

       To recover for a defendant's breach of contract under New York law, a plaintiff must prove by a preponderance of the evidence: "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." Diesel Props S.R.L. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011); see also Palmetto Partners, L.P. v. AJW Qualified Partners, LLC, 83 A.D.3d 804, 806 (2d Dep't 2011)

(same); Clearmont Prop., LLC v. Eisner, 58 A.D.3d 1052, 1055 (3d Dep't 2009) (same).  "The formation of a valid, express contract under New York law requires an offer, acceptance, consideration, mutual assent, and intent to be bound."  Int'l Bus. Machs. Corp. v. Johnson, 629 F. Supp. 2d 321, 330 (S.D.N.Y. 2009) (citing Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004); Maffea v. Ippolito, 247 A.D.2d 366, 367 (2d Dep't 1998)).

Defendants seek to defeat the breach of contract claim in two ways.  First, they assert that the Contract "lacks consideration on the part of Blum [because] [t]he writing creates no duty on Blum to perform anything."  Def. Mem. at 9.  Defendants contend that "[i]n the Alleged Contract, Blum never offered anything in exchange of such payment, or promised to return the 246,000 shares nor the warrant of 123,000 shares to Spaha Capital" and that "a conclusion of the business between Spaha Capital and Blum as stipulated therein cannot be deemed his surrender or forbearance of legal right sufficient to support a binding contract."  Id. at 10.  Thus, in their view, the Contract is illusory because "it leaves an unlimited right to decide later the nature or extent of Blum's performance and therefore renders [the] contract unenforceable."  Id. at 11.

Second, in their reply memorandum, defendants assert that the Contract is unenforceable because the "evidence clearly show[s] that the parties were mutually mistaken as to the subject mater of the contract and value of consideration."  Def. Reply at 2.  Defendants seem to assert that the mutual mistake was that the parties believed at the time they signed the Contract that Blum possessed the 123,000 warrant shares while in reality he did not have a valid claim to those shares.  See id. at 6-8.

## 1.    Consideration

The Contract clearly declares Spaha's obligation to pay Blum $300,000 by November 11, 2011.  See Pl. Disclosure at 148.  However, it does not explicitly state anything about Blum's

consideration for this payment.  As Blum has emphasized, there is a great deal of extrinsic

evidence demonstrating that the "agreement between the parties was intended to be the payment

of $300,000.00 in exchange for the shares owned by [Blum]."  Pl. Mem. at 11; see also Blum

Decl. ¶ 36.  While defendants have not explicitly argued that this extrinsic evidence is barred by

the "parol evidence" rule, the Court finds it appropriate to address this issue.

    Where the terms of an agreement are ambiguous, extrinsic evidence (commonly referred

to as "parol evidence") may be admitted to discern the meaning of the terms of the contract.

See, e.g., Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 69 (2d Cir. 2008) (construing

New York law); Olin Corp. v. Ins. Co. of N. Am., 221 F.3d 307, 318 (2d Cir. 2000) (same).

"Whether an ambiguity exists in a written agreement is a question of law for a court to decide

after reading the document as a whole to determine its purpose and intent."  Zinter Handling,

Inc. v. Gen. Elec. Co., 101 A.D.3d 1333, 1335 (3d Dep't 2012) (quotation marks and citation

omitted); accord S. Road Assocs., LLC v. Int'l Bus. Machs. Corp., 4 N.Y.3d 272, 278 (2005).

Once an ambiguity in the agreement is found, a court may consider evidence such as "exchanges

between the contracting parties during the course of negotiations, as well as post-execution

conduct of the parties in performing the contract, admissions by the parties and—in appropriate

circumstances—industry usage or practice."  Fitzpatrick v. Am. Int'l Grp., Inc., 2013 WL

5427883, at *3 (S.D.N.Y. Sept. 27, 2013) (citing cases); see also Schreiber v. Dick Voight

Buick, Inc., 103 A.D.2d 1025, 1026 (4th Dep't 1984) (considering a "rejected prior draft" in

interpreting ambiguous term of a contract); Carter v. Broadway 48th-49th St. Assocs., 2008 WL

1745143, at *4 (N.Y. Sup. Apr. 7, 2008) (considering "prior drafts of the agreement").

    The Contract in this case contains the following clause: "[t]his close [sic] will conclude

all business between [Spaha] and [Blum]."  See Pl. Disclosure at 148.  This clause suggests that

"all business" will be extinguished by the agreement but gives no indication of what such "business" is.  Accordingly, because this clause is ambiguous, it is appropriate to examine the extrinsic evidence presented to determine the parties' intent.  Here, that evidence overwhelmingly demonstrates that the clause refers to Blum's promise to transfer all of his shares in Woodward to Spaha in exchange for $300,000.  First, the various agreements drafted just before the Contract was signed consistently show that Blum's intent was to transfer to Spaha all of his shares and accompanying interests in Woodward stock as consideration for a sizeable payment from Spaha.  The first draft of the agreement — which VanClief wrote, see Def. 56.1 Reply ¶ 41 — is entitled the "Stock Purchase Agreement" and specifically states that "Purchaser shall purchase from Seller [Blum] 369,000 shares of Common stock, issued by Spaha Capital Management dba Woodward Skateparks, in consideration of a promissory note in the amount of $267,500.00," Pl. Disclosure at 93.  The accompanying "Stock Purchase and Indemnification Agreement" notes that "Randolph Blum agrees to sell all interests of Spaha Capital Managmeent dba Woodward Skateparks to an agreeable price and terms . . . ."  Id. at 95.  A second draft of the "Stock Purchase Agreement" is largely the same as the first, with the primary difference being that Blum would receive cash in exchange for his shares rather than a promissory note.  Id. at 118.  The accompanying "Stock Purchase Contract" also reflects that "Randolph Blum will receive for $269,750 for his entire interest."  Id. at 119.  A third draft contains a different pay arrangement but still states "[i]t is the sole intent to repurchase from Randolph Blum his interests and 369,000 shares of Spaha . . . dba Woodward."  Id. at 122.  While these drafts differ somewhat in their pay arrangements, they all impose on Blum an obligation to turn over his shares and other interests in Woodward to Spaha.

     Additionally, an email written by Blum to VanClief on September 6, 2011, states, "you

offered me a pre-IPO buyout of all my shares of WW(369,000) for $269,000 within 30 days."
Id. at 90.  Blum has also submitted evidence that he spoke with VanClief on the phone on
September 30, 2011, during which VanClief  "proposed to pay [Blum] the amount of
$300,000.00 for the shares and for the 8% interest that [Blum] was owed for [his] initial
investment of $123,000."  Blum Decl. ¶ 28; see also Blum Decl. ¶ 36 (the Contract "was
intended to memorialize the agreement that [VanClief] and I had made, which was for him to
pay me $300,000.00 in exchange for my shares and the 8% interest that I was owed.").
Defendants have produced no competent evidence contradicting this assertion and have failed to
refer to any such evidence in response to Blum's Rule 56.1 statement on this point.  See Def.
56.1 Reply ¶ 42, 50.  Tellingly, defendants have not been able to even suggest another way in
which the Contract's "all business" language could reasonably be interpreted based on this
evidence.

　　　Case law in New York is clear that a grant of summary judgment is appropriate if "the
ambiguities [in a contract] may be resolved through extrinsic evidence that is itself capable of
only one interpretation, or where there is no extrinsic evidence that would support a resolution of
these ambiguities in favor of the nonmoving party's case."  Topps Co., Inc., 526 F.3d at 68
(citation removed); see also Chock Full O'Nuts Corp. v. Tetley, Inc., 152 F.3d 202, 204 (2d Cir.
1998) ("Notwithstanding the existence of contractual ambiguities, summary judgment may be
granted if under any of the reasonable interpretations the moving party would prevail.");
Eastman Kodak Co. v. Ricoh Co., Ltd., 2013 WL 4044896, at *7 (S.D.N.Y. Aug. 9, 2013) ("A
court may resolve the ambiguity as a matter of law only where 'there is no extrinsic evidence to
support one party's interpretation of the ambiguous language or if the extrinsic evidence is so
one-sided that no reasonable factfinder could decide contrary to one party's interpretation.'")

14

(quoting Collins v. Harrison-Bode, 303 F.3d 429, 433 (2d Cir. 2002)).  Under these circumstances, where the evidence uniformly supports Blum's asserted interpretation of the Contract, no reasonable jury could conclude that the Contract called for anything other than Blum's transfer of all his shares and accompanying interest in Woodward to Spaha in exchange for $300,000.  Having interpreted the Contract in this way, it is obvious that Blum's obligation to transfer his shares to Spaha is a "benefit to the promisor or [ ] detriment to the promisee" constituting valid consideration.  Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 464 (1982) (citation omitted).

Even if the Contract did not contain the "conclude all business" clause, it would still be enforceable because "'[i]t is not essential to the validity of a contract that the consideration be recited therein since it may be implied, or proved by parol evidence.'"  Sabilia v. Richmond, 2011 WL 7091353, at *24 (S.D.N.Y. Oct. 26, 2011) (quoting Anonymous v. Anonymous, 2004 WL 396492, at *7 (N.Y. Sup. Feb. 9, 2004)); accord Strobe v. Netherland Co., 245 A.D. 573, 576 (4th Dep't 1935) ("It is not essential to the validity of a promise in writing that the consideration should be expressed in the instrument; it may be proven by parol.").  In other words, "where there is a question of mutual assent, the Court may look outside the four corners of the agreement because '[t]he manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract.'"  In re Toscano, 799 F. Supp. 2d 230, 249 (E.D.N.Y. 2011) (quoting Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004)).  Here, it is sufficient that the extrinsic evidence, including the prior drafts of the agreement, the contemporaneous email exchanges, and Blum's declaration, conclusively establishes that Blum had promised to transfer his shares of Woodward to Spaha in exchange for the $300,000.  Cf. Loengard v. Metal & Thermit Corp., 204 F. Supp.

15

74, 76 (S.D.N.Y. 1962) (where plaintiff's consideration "was not specifically referred to in the contract" examining evidence of "[t]he negotiations between plaintiff and [another party]" to find that "the agreement was supported by consideration"); see also Bird v. Computer Tech., Inc., 364 F. Supp. 1336, 1343 (S.D.N.Y. 1973) ("[T]he parol evidence rule is not violated when the oral evidence . . . illuminates the consideration.").

Additionally, we reject defendants' contention that the Contract is illusory or impermissibly indefinite for failing to specify "[t]he time to conclude all business."  Def. Mem. at 10.  Under New York law, "[w]here there is no express provision in a contract relating to time of performance, a reasonable time is implied."  Lake Steel Erection, Inc. v. Egan, 61 A.D.2d 1125, 1126 (4th Dep't 1978) (citation omitted); see also Schmidt v. McKay, 555 F.2d 30, 35 (2d Cir. 1977) ("Since the alleged contract did not specify a time for . . . performance, under New York law appellees were entitled to a reasonable time . . . .") (citing New York cases).  The Contract requires Spaha to make payment by November 11, 2011, see Pl. Disclosure at 148, and, in light of Blum's obligation to transfer his shares to Spaha, the Contract impliedly requires Blum to do so within a reasonable time thereafter.  See generally Nusca v. Fodera, 129 A.D.2d 568, 569 (2d Dep't 1987) ("Since the agreement did not specify the time at which the stock was to be transferred to the plaintiff, an agreement that performance would take place within a reasonable time was inferred.").

### 2.   Mutual Mistake

Defendants argue that the parties entered into the Contract under the mistaken belief that Blum had 369,000 shares of stock to sell while in fact he only had 246,000 shares because he never possessed a valid interest in the 123,000 warrant shares.  See Def. Reply at 6-8.  Under New York law, "a contract entered into because of a mutual mistake of material fact will

16

generally be avoidable." Alden Auto Parts Warehouse, Inc. v. Dolphin Equip. Leasing Corp., 682 F.2d 330, 333 (2d Cir. 1982) (construing New York law). "A mutual mistake under New York law means that both parties 'shared the same erroneous belief as to a material fact, and their acts did not in fact accomplish their mutual intent.'" ACA Galleries, Inc. v. Kinney, 928 F. Supp. 2d 699, 701 (S.D.N.Y. 2013) (quoting Allen v. WestPoint–Pepperell, Inc., 945 F.2d 40, 46 (2d Cir. 1991)). However, the party asserting the existence of a mutual mistake must show "that the mistake in question is mutual, substantial, material and exists at the time the contract is entered." Rodriguez v. Mower, 56 A.D.3d 857, 858 (3d Dep't 2008) (citing Cnty. of Orange v. Grier, 30 A.D.3d 556, 556-57 (2006)). Additionally, it has been held that "the mistake must be so material that it goes to the foundation of the agreement." Simkin v. Blank, 19 N.Y.3d 46, 52 (2012) (internal punctuation and citation omitted). Finally, the New York Court of Appeals has held that there is a "'heavy presumption that a deliberately prepared and executed written instrument manifest[s] the true intention of the parties,'" and thus, the "proponent of reformation [on grounds of mutual mistake] must 'show in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties.'" Chimart Assoc. v. Paul, 66 N.Y.2d 570, 574 (1986) (quoting Backer Mgmt. Corp. v. Acme Quilting Co., 46 N.Y.2d 211, 219 (1978)). The party alleging that there is a mutual mistake "must establish such mistake by clear and convincing evidence." See, e.g., EGW Temporaries, Inc. v. RLI Ins. Co. , 83 A.D.3d 1481,1482 (4th Dep't 2011).

Defendants' claim of mutual mistake does not meet this exacting standard. Defendants have introduced no evidence establishing that Spaha or VanClief actually believed at the time of the Contract that Blum had the full extent of the interest in Woodward that Blum was claiming, let alone clear and convincing evidence on this point. See generally Rosenberg v.

17

<u>Comprehensive Cmty. Dev. Corp.</u>, 1998 WL 809522, at *3 (S.D.N.Y. Nov. 19, 1998) (granting

plaintiff's motion for summary judgment because "defendant has failed to adduce any

admissible evidence from which any reasonable juror could conclude that plaintiff shared any of

these purported factual misapprehensions that defendant alleges").  To the contrary, the evidence

provided by the parties suggests that Spaha and VanClief were in doubt as to Blum's claim for

the warrant shares but that they nonetheless moved forward with the Contract to "conclude all

business" with Blum and buy out whatever shares Blum did in fact own.  <u>See</u>, <u>e.g.</u>, Blum Decl.

¶¶ 26-28; VanClief Decl. ¶ 19; Pl. Disclosure at 77, 148.

Additionally, even if it could be shown that both sides mistakenly believed that Blum

owned the warrant shares, defendants' mutual mistake defense would still fail because this belief

would have been the result of VanClief and Spaha's own negligence.  It is well-established that

under New York law, the mutual mistake doctrine "may not be invoked by a party to avoid the

consequences of its own negligence." <u>De Sole v. Knoedler Gallery, LLC</u>, 974 F. Supp. 2d 274,

320 (S.D.N.Y. 2013) (citations omitted); <u>accord</u> <u>Gitelson v. Quinn</u>, 2014 WL 2459661, at *1 (1st

Dep't 2014) ("'Mistake, to be available in equity, must not have arisen from negligence, where

the means of knowledge were easily accessible.'") (quoting <u>DaSilva v. Musso</u>, 53 N.Y.2d 543,

551 (1981)).  Furthermore, courts have found that the mutual mistake doctrine does not apply

where "the party wishing to invoke the doctrine . . . was aware of his limited knowledge but

acted anyway."  <u>ACA Galleries, Inc.</u>, 928 F. Supp. 2d at 701-02 (rejecting plaintiff's mutual

mistake argument where plaintiff's mistaken belief was the result of its failure to investigate);

<u>accord</u> <u>P.K. Dev., Inc. v. Elvem Dev. Corp.</u>, 226 A.D.2d 200, 201 (1st Dep't 1996)

("[D]efendant's negligence, or conscious ignorance, regarding the [alleged mistake] bars

rescission.") (internal quotation marks and citation omitted).  Here, assuming <u>arguendo</u> that

18

Blum did not in fact own the warrant shares and that defendants were under the mistaken belief that he did, such a belief could only have been a result of VanClief and Spaha's own negligence and failure to properly investigate before signing the Contract.  At the time of contracting, Spaha owned Woodward, see VanClief Decl. ¶ 10, and thus was in the best position to ascertain how many shares of Woodward stock Blum actually owned before agreeing to buy out his entire interest in Woodward.  Accordingly, defendants' mutual mistake claim fails as a matter of law because, at best, defendants' incorrect belief as to the validity of Blum's warrant shares was the result of negligence and a failure to adequately investigate before contracting.  Cf. 2001 Commerce St. Corp. v. Star Enter., 14 A.D.3d 504, 505 (2d Dept 2005) (rejecting plaintiff's mutual mistake argument because "[a]t best, the plaintiff's negligence . . . establishes a unilateral mistake on its part").

In sum, there is no genuine issue of material fact as to the validity and enforceability of the Contract.  Accordingly, because there is no dispute that defendants failed to pay Blum the $300,000 by November 11, 2011, see Blum Decl. ¶ 39, judgment must be entered against defendants in this amount (plus pre-judgment interest, see N.Y.C.P.L.R. § 5001(a)).  However, the Court cannot at this time enter a final judgment on this claim because the Contract cannot be effectuated without requiring Blum to execute documents and/or deliver certificates to transfer his shares to Spaha.  While "New York courts routinely award specific performance in cases involving the conveyance of stock in privately held corporations," Vacold LLC v. Cerami, 545 F.3d 114, 130 (2d Cir. 2008) (citing New York cases), the Court wishes to give the parties the opportunity to be heard on this issue as it was not the subject of any briefing.

C.      Blum's Breach of Contract Claim Against VanClief

VanClief seeks summary judgment dismissing Blum's breach of contract claim against VanClief on the ground that he is protected from personal liability under N.Y. Ltd. Liab. Co. Law § 609(a) and because there is no basis for piercing the corporate veil.  See Def. Mem. at 4-6.  We agree.  Spaha is a limited liability company of the State of New York.  See Compl. ¶ 3; Answer, filed July 23, 2013 (Docket # 4), ¶ 3.  Furthermore, VanClief plainly signed the Contract on behalf of Spaha in his capacity as Spaha's managing director.  See Pl. Disclosure at 148; VanClief Decl. ¶ 1.  Under N.Y. Ltd. Liab. Co. Law § 609(a), "[n]either a member of a limited liability company, a manager of a limited liability company . . . nor an agent of a limited liability company. . . is liable for any debts, obligations or liabilities of the limited liability company or each other, whether arising in tort, contract or otherwise, solely by reason of being such member, manager or agent or acting (or omitting to act) in such capacities or participating . . . in the conduct of the business of the limited liability company."

Because VanClief is "expressly exempt from personal responsibility for the obligations" of Spaha, Blum can only recover against him on the breach of contract claim by piercing the corporate veil.  Collins v E-Magine, 291 A.D.2d 350, 351 (1st Dep't 2002); accord Michael v. Banks, 901 F. Supp. 2d 354, 357 (N.D.N.Y. 2012) ("Because the breached contract for which plaintiffs seek damages was between plaintiffs and a corporate entity . . . [the individual defendants] will be liable only if the . . . corporate veil is pierced.").  "Under New York law, a court may pierce the corporate veil where 1) the owner exercised complete domination over the corporation with respect to the transaction at issue, and 2) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil."  MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 63 (2d Cir. 2001) (internal quotation marks

and citation omitted); accord Grammas v Lockwood Assoc., LLC, 95 A.D.3d 1073, 1075 (2d

Dep't 2012) ("In order to state a viable cause of action under the doctrine of piercing the

corporate veil, the plaintiff must allege facts that, if proved, indicate that the shareholder

exercised complete domination and control over the corporation [or LLC] and abused the

privilege of doing business in the corporate [or LLC] form to perpetrate a wrong or injustice.")

(alteration in original) (internal quotation marks and citation omitted).

Here, Blum has provided no evidence on these issues. Indeed, the evidence in the record

shows without contradiction that Blum would not be able to satisfy the first requirement for

piercing the corporate veil — that VanClief exercised complete dominion over Spaha. In his

declaration, VanClief attests that Spaha "observes corporate formalities like having a corporate

office, a certificate of registration with the State of New York, [and] an operating agreement"

and that it "maintains records and books . . . [and] has its own bank account." VanClief Decl.

¶¶ 2-3. Additionally, VanClief asserts, "I have never operated Spaha Capital as if it is my own

personal property." Id. ¶ 3. Because Blum has not disputed these assertions and has not

introduced evidence to the contrary, there is no genuine issue of material fact on this issue. We

therefore grant summary judgment dismissing Blum's breach of contract claim against VanClief.

> D.    Blum's Unjust Enrichment Claim

Having found the Contract to be valid and enforceable against Spaha, defendants are

entitled to summary judgment on the unjust enrichment claim because "[t]he existence of a valid

and enforceable written contract governing a particular subject matter ordinarily precludes

recovery in quasi contract for events arising out of the same subject matter." Beth Isr. Med. Ctr.

v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 587 (2d Cir. 2006) (quoting

Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388-89 (1987)); accord N.

Shipping Funds I, LLC v. Icon Capital Corp., 921 F. Supp. 2d 94, 107 (S.D.N.Y. 2013)

(dismissing unjust enrichment claim because it was "duplicative of the breach of contract

claim").   Because Blum provides no reason why this rule should not apply, we grant summary

judgment in defendants' favor on this issue and dismiss Blum's unjust enrichment claim.

      E.     Blum's Breach of Fiduciary Duty Claim Against VanClief

Blum alleges that "[a]s a broker acting on behalf of [Blum] in the purchase of shares,

[VanClief] owed a fiduciary duty to [Blum]" and that VanClief breached that duty when he

"failed to turn over the 123,000 shares for the warrant."  Compl. ¶ 24-25.

"The elements of a cause of action to recover damages for breach of fiduciary duty are

(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages

directly caused by the defendant's misconduct."  Armentano v. Paraco Gas Corp., 90 A.D.3d

683, 684-85 (2d Dep't 2011) (internal quotation marks and citations omitted).  "A fiduciary

relationship exists . . . when one person is under a duty to act for or to give advice for the benefit

of another upon matters within the scope of the relation."  Flickinger v. Harold C. Brown & Co.,

Inc., 947 F.2d 595, 599 (2d Cir. 1991) (internal quotation marks, alterations, and citation

omitted); accord Sokol Holdings, Inc. v. BMB Munai, Inc., 726 F. Supp. 2d 291, 306 (S.D.N.Y.

2010) (same).

Assuming arguendo that VanClief owed a fiduciary duty to Blum, VanClief is

nevertheless entitled to summary judgment on this claim because Blum has failed to produce any

evidence establishing that VanClief engaged in conduct that constituted a breach of that duty or

that any such misconduct caused Blum to incur damages.  While it is difficult for the Court to

discern exactly what conduct Blum is referring to as the basis for the alleged breach, it appears

that he faults VanClief for failing to deliver the warrant shares to Blum as promised and for not

adequately explaining to Blum what shares he was owed under the original investment agreement.  See Pl. Mem. at 1, 7-9.

Under New York law, "[a] broker is a fiduciary . . . [who] owes a duty of good faith and loyalty to his principal . . . [and thus] is under a duty to disclose to his principal all the material information that he has concerning the transaction involved."  BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 700-01 (2d Cir. 1993) (citations omitted).  At the same time, a broker's duty to the client is on a "transaction-by-transaction basis" in that "[t]he client may enjoy the broker's advice and recommendations with respect to a given trade, but has no legal claim on the broker's ongoing attention."  de Kwiatkowski v. Bear, Stearns & Co., Inc., 306 F.3d 1293, 1302 (2d Cir. 2002).  Thus, Blum must produce evidence establishing that with regard to the specific transaction in which VanClief served as his broker — Blum's 2006 investment in Woodward — VanClief in some way breached his fiduciary duty to Blum.

To the extent that Blum's claim is, as he puts it in his complaint, that VanClief "failed to turn over the 123,000 [warrant] shares," Compl. ¶ 25, or by "not obtaining what [Blum] had bargained for," Pl. Mem. at 8, this cannot on its own serve as the basis for his breach of fiduciary duty claim because Blum has not shown that VanClief, who did not work for Woodward at the time, was responsible in his capacity as a broker for any failure on Woodward's part to deliver to Blum the shares and other compensation to which Blum claims he was entitled.  In other words, although there is evidence establishing that VanClief had originally told Blum that he was owed the warrant shares and that Blum did not receive those shares, these facts do not on their own support a claim for breach of fiduciary duty without some showing that VanClief's action or inaction caused Blum not to receive the shares.  While Blum contends in his sworn declaration that VanClief "failed to make the deal that we had agreed upon," Blum Decl. ¶ 15, this statement

is entirely conclusory.  No details are provided as to precisely what actions VanClief did not take and why they were within his power to effectuate.  It is well-established that speculative statements do not serve to create a genuine issue of material fact where one does not otherwise exist.  See Quarles v. Gen. Motors Corp. (Motors Holding Div.), 758 F.2d 839, 840 (2d Cir. 1985) ("Once a moving party has made a showing that no material issues of fact are in dispute, mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion.").

Similarly, to the extent that Blum contends that VanClief failed to adequately disclose or explain the contours of the investment agreement or to keep Blum informed about the status of the warrant shares, Blum has marshaled no evidence demonstrating that VanClief withheld or otherwise failed to impart to Blum any relevant information known to VanClief or to his firm. Indeed, the email and instant messenger conversations disclosed by the parties establish that VanClief was in frequent communication with Blum regarding Blum's investment in Woodward and about Woodward's claim to the additional warrant shares.  Because Blum has failed to adduce evidence supporting the elements of this aspect of his claim, summary judgment must be granted to VanClief on this issue as well.

IV.   CONCLUSION

For the above reasons, defendants' motion (Docket # 18) and Blum's motion (Docket # 28) for summary judgment are each granted in part and denied in part.

SO ORDERED.

Dated: September 12, 2014
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge